## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA

---

| | |
|---|---|
| STUDENTS FOR LIFE ACTION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>MARTY JACKLEY, in his official capacity as Attorney General of the State of South Dakota, and<br><br>MONAE JOHNSON, in her official capacity as South Dakota Secretary of State,<br>　　　　　Defendants. | No. 3:23-cv-03010-RAL<br><br><br><br>**First Amended Complaint** |

---

## <u>INTRODUCTION</u>

1.  Under the First Amendment, "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (cleaned up).

2.  But South Dakota law forces nonprofit organizations engaged in pure issue advocacy to comply with reporting requirements and include a government message in any "communication concerning a candidate or a ballot question"— even if the communication does not advocate for the election or defeat of a

candidate and occurs *years* before any election. S.D. Codified Laws § 12-27-1(11). Every such communication requires "a disclaimer that clearly and forthrightly" identifies "the names of the five persons making the largest contributions in aggregate to the [organization] during the twelve months preceding." S.D. Codified Laws § 12-27-16(1).

3.  These requirements apply to any issue advocacy that happens to mention any candidate for office. They are not limited to express advocacy—that is, advocacy promoting a candidate's election or defeat—or its functional equivalent. Instead, the statute imposes speech burdens on virtually any communications about public officials.

4.  South Dakota's compelled speech scheme violates the constitutional rights of Plaintiff Students for Life Action, which has engaged in advocacy about issues and office holders in South Dakota in the past and intends to do so again.

5.  First, the scheme is unconstitutionally overbroad because it sweeps far beyond regulation of express advocacy or its functional equivalent to criminalize ordinary issue advocacy of the type in which Students for Life Action engages. Supreme Court precedent requires "distinguish[ing] campaign speech from issue advocacy." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 480 (2007). South Dakota has failed to do so, and thus unconstitutionally regulates issue advocacy.

6.  Second, when the government forces an organization to speak a government-drafted message it would not otherwise say, courts must subject that compulsion to the strictest First Amendment scrutiny. Forced speech distracts from the message an organization wishes to communicate to the public. It also creates the unmistakable tendency to chill speech by subjecting donors identified in advertisements to "cancel culture" harassment, "doxxing," and other retaliation from people who disagree with the message. And the threat of future retaliation will chill speech by preventing donors from giving money to support advertisements in the first place. South Dakota cannot justify this compulsion of speech because it is not narrowly tailored to serve a sufficient government interest.

7.  Third, the scheme is void for vagueness because it does not define key terms, particularly what it means for speech to be "concerning" candidates or ballot questions. Thus, citizens face the threat of criminal sanctions for engaging in protected speech because of the law's vagueness. "The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

8.  Plaintiff therefore brings this lawsuit to protect its core First and Fourteenth Amendment rights to free speech and association.

9.  The scheme that Plaintiff challenges has previously been challenged and temporarily enjoined by this Court. *Inst. for Free Speech v. Jackley*, 340 F. Supp.

3

3d 853, 862 (D.S.D. 2018). Because that case became moot, *Inst. for Free Speech v. Ravnsborg*, 416 F. Supp. 3d 894, 897 (D.S.D. 2019), this case is necessary to protect constitutional rights that are threatened by an overbroad, vague regulation of speech about public issues.

## PARTIES

10.  Plaintiff Students for Life Action is a 501(c)(4) nonprofit social-welfare organization based in Fredericksburg, Virginia, which frequently engages in advocacy nationwide, including advocacy in South Dakota.

11.  Defendant Marty Jackley, sued in his official capacity, is the Attorney General of South Dakota.

12.  Defendant Monae Johnson, sued in her official capacity, is the Secretary of State of South Dakota.

## JURISDICTION AND VENUE

13.  This Court has subject matter jurisdiction because this action presents a federal question. 28 U.S.C. §§ 1331, 1343. Specifically, this action arises out of the First and Fourteenth Amendments of the United States Constitution, and Plaintiff brings this action under 42 U.S.C. § 1983.

14.  Personal jurisdiction exists because the Attorney General of South Dakota is sued in his official capacity, is responsible for enforcement of the statute at issue, and maintains his office in this District.

15. Further, personal jurisdiction exists because the Secretary of State is sued in her official capacity, has authority to administer fines for failures to comply with campaign finance disclosures, and maintains her office in this District.

16. Venue is appropriate under 28 U.S.C. § 1391(b) because the Defendant resides in and has his office in this District, and the events giving rise to the claim took place in this District.

## FACTUAL ALLEGATIONS

**Background**

17. Students for Life Action is a nonprofit organization dedicated to training and mobilizing this generation of pro-life leaders to impact public policy and influence key elections.

18. Students for Life Action engaged in advocacy in South Dakota on June 6, 2022—the day before the June 2022 primary election—to inform voters about 12 incumbent legislators' voting records on banning chemical abortions and about their responses to candidate surveys. Each of these communications cost Students for Life Action $116.62.

19. None of Students for Life Action's communications told the recipients who they should or should not vote for.

20. Rather, Students for Life Action sent text messages informing voters of candidates' positions on abortion-related issues. Some text messages urged

recipients to encourage a candidate who had taken a pro-life pledge to keep their pledge if elected. Other text messages urged recipients to encourage candidates who had not taken a pro-life pledge to nonetheless vote for pro-life legislation if elected. Examples of these text messages are attached to the complaint as Exhibit 1.

21.  In 2022, Students for Life Action also sent mailers to South Dakotans, urging them to contact their state legislators to encourage them to support pro-life legislation. Examples of these mailers are attached as Exhibit 2.

22.  In the next two years, Students for Life Action intends to continue to communicate with the public in South Dakota through issue advocacy about candidates and public office holders. These intended communications will exceed $100 in value.

23.  Students for Life Action, on advice of its counsel, always seeks to comply fully with applicable state laws and regulations for campaign-related speech.

**South Dakota's Advocacy Restrictions**

24.  South Dakota law defines "independent communication expenditure" as "an expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person, entity, or political committee for a communication concerning a candidate or a ballot question which is not made to, controlled by, coordinated with, requested by, or made upon consultation with that

candidate, political committee, or agent of a candidate or political committee."
S.D. Codified Laws § 12-27-1(11).

25.  This provision does not require that the relevant "independent communication" "expressly advocate" for a candidate or ballot question, or that the communication serve as a functional equivalent of such advocacy. *Cf.* S.D. Codified Laws § 12-27-1(9) (defining "expressly advocate," including its functional equivalent).

26.  S.D. Codified Laws § 12-27-16 imposes several requirements on "independent communication expenditures by persons and entities related to communications concerning candidates, public office holders, ballot questions, or political parties who are not controlled by, coordinated with, requested by, or made upon consultation with that candidate, political committee, or agent of a candidate or political committee."

27.  Persons and entities who pay, or promise to pay, more than $100 for such a communication must "append to or include in each communication a disclaimer that clearly and forthrightly" states "'Top Five Contributors,' including a listing of the names of the five persons making the largest contributions in aggregate to the entity during the twelve months preceding that communication." S.D. Codified Laws § 12-27-16.

28.  In addition, a person or entity who pays, or promises to pay, more than $100 for such a communication must file an "independent expenditure communication statement" within 48 hours of the time the communication is disseminated or published. *Id.*

29.  That information must include the person or entity's mailing address (and, if an entity, website address); identify the expenditures in question; and provide "the name of each candidate, public office holder, ballot question, or political party mentioned or identified in each communication, the amount spent on each communication, and a description of the content of each communication." *Id.*

30.  S.D. Codified Laws § 12-27-16 was amended to include the "Top 5 Contributors" rule under Governor Daugaard, who signed the rule into law on March 20, 2013.[1]

31. The statute contains no time limitations. The statute applies to *any communication* at *any time*—regardless of whether the next election involving a candidate or office holder is three weeks, three months, or three years away. S.D. Codified Laws § 12-27-16.

**Enforcement and previous challenges of S.D. Codified Laws § 12-27-16**

32.  The law charges the Defendant Secretary of State with enforcing its civil penalties. S.D. Codified Laws § 12-27-29.2.

---

[1] https://sdlegislature.gov/Statutes/Session_Laws/Chapter/5286.

33.  South Dakota law makes failure to disclose donors in communications a *crime*: a nonprofit that fails to make the disclosure commits a Class 2 misdemeanor. S.D. Codified Laws § 12-27-16. A subsequent offense within one calendar year is a Class 1 misdemeanor. *Id.*

34.  The penalty for a Class 2 misdemeanor is thirty days imprisonment, a five hundred dollar fine, or both. S.D. Codified Laws § 22-6-2. The penalty for a Class 1 misdemeanor is one year of imprisonment, a two thousand dollars fine, or both. *Id.*

35.  The law charges the Defendant Attorney General with enforcing its criminal penalties. S.D. Codified Laws § 12-27-35. The Attorney General may also bring an action for a civil penalty of up to $10,000 per violation. *Id.* The law also empowers the Attorney General to demand access to a nonprofit's records if necessary for such enforcement. S.D. Codified Laws § 12-27-36. And the law separately authorizes the Attorney General to bring actions for civil penalties of up to $2,000 per violation for violations of the independent communication expenditure statute. S.D. Codified Laws § 12-27-43.

36.  The Defendant Attorney General has announced that one of his top priorities is expanded enforcement of South Dakota's campaign finance statutes. Annie Todd, *Attorney General Marty Jackley wants to tackle election integrity*, Argus Leader (Jan. 19, 2023). He has sought new legislation to allow his office to

prosecute campaign finance violations. *South Dakota Attorney General Jackley Announces Legislative Package*, Press Release (Jan. 17, 2023). He has criticized decisions by his predecessors not to vigorously enforce campaign laws. John Hult, *Ex-candidate's case helps spur election law proposal from attorney general*, South Dakota Searchlight (Jan. 19, 2023).

37.  The top-five donor rule that Plaintiff challenges has already been challenged for violating nonprofit groups' First Amendment rights. Indeed, this Court entered a preliminary injunction against it. *Inst. for Free Speech v. Jackley*, 340 F. Supp. 3d 853, 862 (D.S.D. 2018). That case became moot, however, because the plaintiff organization could not point to likely future elections that would involve speech subject to the Act. *Inst. for Free Speech v. Ravnsborg*, 416 F. Supp. 3d 894, 897 (D.S.D. 2019).

**Injury to Plaintiff**

38.  S.D. Codified Laws § 12-27-16 injures Plaintiff Students for Life Action because Plaintiff makes expenditures that fall under the statute's apparent definition, subjecting it to the statute's reporting and disclosure requirements.

39.  The top-five donor rule in particular injures Plaintiff Students for Life Action, and Plaintiff therefore has standing to bring this action, because Plaintiff engages in public communications apparently subject to the rule.

40.  Plaintiff also has standing because the rule chills the speech of Plaintiff's donors for fear of exposure and retaliation.

41.  In the First Amendment context, and particularly for chilled speech, the Supreme Court has recognized a "lessening of prudential limitations on standing." *Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Indeed, "when there is a danger of chilling speech," society's interest in challenging a statute may very well "outweigh" the desire to avoid constitutional adjudication. *Id.* If a plaintiff challenges a statute because it causes someone "not before the court to refrain from constitutionally protected speech or expression," this is an injury sufficient to confer standing. *Id.* at 956–57.

42.  This case comes amid a time of national reckoning with "cancel culture." Public identification with controversial causes and organizations can result in significant harassment and threats.

43.  South Dakota's on-ad donor disclosure law discourages donors from making contributions to nonprofits like Students for Life Action that advocate positions with which they agree, for fear that their names will be highlighted in public advertisements. The loss of donors who are deterred by negative reactions to their publicly announced donations is an injury to Students for Life Action. *See* Stan Oklobdzija, *Public Positions, Private Giving: Dark Money and Political*

*Donors in the Digital Age*, Research & Politics (2019) (concluding "disclosure laws have an effect on a donor's calculus to contribute to a political cause").

44.  People who make donations that are disclosed may become targets of "cancel or call-out culture that has resulted in people losing employment, being ejected or driven out of restaurants while eating their meals; and where the Internet removes any geographic barriers to cyber harassment of others." *Ams. for Prosperity v. Grewal*, No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793, at *61 (D.N.J. Oct. 2, 2019); *see also Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022).

45.  Going hand-in-hand with cancel culture is "doxxing," a practice victimizing "liberals and conservatives alike." Chaelin Jung, *Twitter, Don't Do Your Thing: Anti-Doxxing Legislation Is Urgently Needed to Stop This Out-of-Control Practice*, Brown Political Review (April 6, 2021).[2] "Doxxing" became the widely used term for publicly posting someone's personal information "as a form of revenge" to promote harassment, violence, and intimidation. *Id.* This information often includes an individual's home address, and some people who have been "doxxed" have even had to flee their homes in the interest of safety. *Id.*

46.  Doxxing occurs repeatedly to supporters of the pro-life cause. In 2021, for example, doxxing victimized a Texas Right to Life staffer after his home address

---

[2] https://brownpoliticalreview.org/2021/04/twitter-dont-do-your-thing/.

was widely circulated on the internet. He received numerous death threats, including ones stating, "we know where you live." Steven Ertelt, *Pro-Life Leader Gets Death Threats After Planned Parenthood Doxxing: "Die! You Should Have Been Aborted!"* LifeNews.com (Sep. 14, 2021).[3]

47.  Students for Life Action is aware of a substantial surge in doxxing and "cancel culture" activity targeting pro-life organizations and their supporters since the leak of the Supreme Court's draft opinion in *Dobbs v. Jackson Women's Health Organization* in May 2022. Pro-lifers have seen "unprecedented levels of threats, vandalism and acts of destruction" nationwide since *Dobbs*. Angie Leventis Lourgos, *Arson. Vandalism. Threats. Abortion Clinics, Abortion Opponents Face Violence After the Fall of* Roe, Chi. Trib. (Feb. 5, 2023).[4]

48.  Not only pro-life organizations like Students for Life Action but also the companies and individuals who donate financially to pro-life organizations and politicians have been targeted for negative publicity, boycotts, and other retribution. *See, e.g.*, Nicole Gaudiano, et al., *AT&T, Walmart, Citi, and Other Megacorporations Bankrolled a Wave of State Abortion Bans*, Business Insider (June 24, 2022)[5]; Brian Schwartz, *Business Leaders Helped to Bankroll the Anti-*

---

[3] https://www.lifenews.com/2021/09/14/pro-life-leader-gets-death-threats-after-planned-parenthood-doxxing-die-you-should-have-been-aborted/.
[4] https://www.chicagotribune.com/news/breaking/ct-violence-abortion-clinics-pregnancy-centers-20230205-6h6lfk32jncqnowxuvayb33yea-story.html.
[5] https://www.businessinsider.com/state-abortion-ban-sponsors-bankrolled-by-att-walmart-citi-corporations-2022-5.

*Abortion Groups Who Could Soon See* Roe v. Wade *Overturned*, CNBC.com (May 6, 2022)[6].

49.  Retaliation against donors to socially conservative causes is not a new phenomenon. In 2014, Mozilla CEO Brendan Eich was forced to resign from his position after his donation to California's Proposition 8 campaign sparked "outrage." Heather Kelly, *Mozilla CEO Resigns over Anti-Same-Sex-Marriage Controversy*, CNN BUSINESS (April 3, 2014).[7] Even though Eich made the donation in 2008, he received harassment for the donation in 2014, causing him to leave a company he co-founded in 1998. *Id.*

**Relevant Legislation**

50.  South Dakota leaders have recognized the serious implications of doxxing and the chilling effect it has on donors, taking some proactive steps to address this problem. On March 3, 2021, Governor Kristi Noem signed into law a bill reforming the South Dakota Nonprofit Act.  South Dakota leaders recognized, in overwhelmingly approving the measure, that donor disclosures have the effect of subjecting donors to harassment and intimidation.

51.  That bill, HB1079, states:

> An executive branch agency, bureau, department, division, board, commission, officer, or official may not

---

[6] https://www.cnbc.com/2022/05/06/roe-v-wade-opinion-business-leaders-donate-to-anti-abortion-groups.html?__source=sharebar|twitter&par=sharebar.

[7] https://money.cnn.com/2014/04/03/technology/mozilla-ceo/index.html.

> require any annual filing or reporting of a nonprofit corporation or charitable trust that is more stringent, restrictive, or expansive than that required by state or federal law.

S.D. §§ 47-24-19 (2021).

52. Governor Noem signed into law a companion bill, SB103, on March 29, 2021, which provided a specific right to donor privacy. That new statutory section contains the following provision:

> Any natural person who supports a nonprofit corporation has a right to personal privacy and confidentiality regarding the release of personal affiliation information by a public agency. A public agency may not:
>
> (1) Require any natural person or nonprofit corporation to provide the public agency with personal affiliation information or otherwise compel the release of personal affiliation information;
>
> (2) Release, publicize, or otherwise publicly disclose personal affiliation information in the public agency's possession; or
>
> (3) Request or require a current or prospective contractor or grantee with the public agency to provide the public agency with a list of nonprofit corporations to which it has provided financial or nonfinancial support.

S.D. §§ 47-24-22 (2021).

53. The new statutory framework also creates a right to sue for any person who is harmed by an unlawful disclosure. S.D. §§ 47-24-23 (2021).

54.  However, the South Dakota legislature has not yet taken similar steps to protect nonprofit donors in the election communication context, even though the same concerns cited by state officials are equally applicable in this context.

## COUNT I

**S.D. Codified Laws § 12-27-16 violates the First and Fourteenth Amendments on its face because it is overbroad.**

55.  The allegations contained in all preceding paragraphs are incorporated herein by reference.

56. The Supreme Court has approved of certain regulations of expenditures made for "express advocacy" communications—that is, communications "expressly advocating the election or defeat of a candidate"—and their "functional equivalent." *Wis. Right to Life*, 551 U.S. at 456, 477–78. A communication constitutes express advocacy "only if [it] is susceptible of no reasonable interpretation other than an appeal to vote for or against a specific candidate." *Id.* at 469–70.

57. The Supreme Court has held, however, that the First Amendment prohibits the government from imposing restrictions on "issue advocacy." *See Wis. Right to Life*, 551 U.S. at 477–81; *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 833 (7thCir. 2014). "Issue advocacy conveys information and educates," and its "impact on an election, if it exists at all, will come only after the voters hear the

information and choose—uninvited by the ad—to factor it into their voting decisions." *Wis. Right to Life*, 551 U.S. at 470.

58.  "In the First Amendment context, . . . a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality opinion) (internal quotations omitted).

59.  S.D. Codified Laws § 12-27-16 is overbroad and violates the First and Fourteenth Amendments on its face because it subjects organizations to ongoing disclosure requirements based on expenditures for communications "concerning" public office holders, even if those communications are not express advocacy or its functional equivalent.

60.  S.D. Codified Laws § 12-27-16 is overbroad on its face because it imposes burdens on expenditures for practically any discussion of any public official, including speech that is not express advocacy or its functional equivalent.

61.  S.D. Codified Laws § 12-27-16 unconstitutionally burdens Students for Life Action's speech because it imposes reporting and disclosure requirements on

Students for Life Action based on its issue advocacy communications about officeholders that do not advocate for the election or defeat of a candidate.

62. Because it regulates communications that are not express advocacy or its functional equivalent, South Dakota's scheme is not narrowly tailored to serve the only interests the Supreme Court has identified that could justify requiring disclosure of an organization's donors and other reporting requirements: (1) "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek . . . office" and (2) "deter[ring] actual corruption and avoid[ing] the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976) (internal citation and marks omitted); *see also Wisconsin Right to Life*, 551 U.S. at 477–81.  Thus, South Dakota's law unduly and unconstitutionally burdens the issue advocacy speech of Plaintiff and others, which cannot be subjected to disclosure requirements.

63.  Plaintiff is entitled to an injunction under 42 U.S.C. § 1983 barring the continued enforcement of S.D. Codified Laws § 12-27-16.

## COUNT II

**The on-ad donor disclosure rule violates the First and Fourteenth Amendments.**

64.  The allegations contained in all preceding paragraphs are incorporated herein by reference.

65.  South Dakota's top-five donor disclosure rule, S.D. Codified Laws § 12-27-16, compels speech: it prescribes a government-drafted script that nonprofit organizations, including Plaintiff, must speak in all of their communications covered by the rule.

66.  The rule is content-based: it applies only to a communication that "concerns a candidate, public office holder, ballot question, or political party."

67.  "Protection of political speech is the very stuff of the First Amendment." *Republican Party v. White*, 416 F.3d 738, 748 (8th Cir. 2005).

68.  Laws that compel speech are subject to strict scrutiny. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 754 (8th Cir. 2019).

69.  Speech regulations based on the content of a message are likewise subject to strict scrutiny. *Id*.

70.  Laws regulating speech about elections are also generally subject to strict scrutiny as content-based laws. *City of Austin v. Reagan Nat'l Adver. Of Austin, LLC*, 142 S. Ct. 1464, 1472 (2002).

71.  For all these reasons, the statute is subject to strict scrutiny. And South Dakota's government-imposed content-altering scripts cannot survive strict scrutiny because they cannot be justified by any compelling interest. Nor are they the least restrictive means of providing such information. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

72.  Even if the regulation were treated as a campaign finance rule subject only to exacting scrutiny, the government cannot show a sufficient interest to justify the burden placed on Plaintiff. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 875 (8th Cir. 2012) (en banc).

73.  The regulatory scheme cannot survive exacting scrutiny because South Dakota does not have a substantial interest in forcing nonprofits to disclose their donors in advocacy communications, and the scheme is not narrowly tailored to such an interest. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 875 (8th Cir. 2012) (en banc).

74.  The state's informational interest does not suffice. *Calzone v. Summers*, 942 F.3d 415, 425 (8th Cir. 2019). The informational value of knowing Plaintiff's top five donors is significantly less than the informational value of knowing the speaker/sponsor of the expenditure itself. Moreover, the informational interest as structured here is particularly unhelpful because Students for Life Action's top five

donors nationally in a calendar year may not be representative of the organization's work specifically in South Dakota, or familiar to South Dakotans.

75. South Dakota's on-ad donor disclaimer law is not narrowly tailored. South Dakota does not require on-ad donor disclaimer by candidates, political action committees, political parties, or ballot measure committees.

76. The law is not narrowly tailored because it applies at all times to all speech concerning public office holders, including issue advocacy not related to or close in time to an election. S.D. Codified Laws § 12-27-16.

77. The law is not narrowly tailored because it applies to communications as low in value as $100.

78. The law is not narrowly tailored because it imposes an on-ad disclaimer requirement instead of only an off-ad disclosure requirement.

79. The informational value gained by South Dakota's on-ad donor disclaimer law does not outweigh the burdens imposed on Students for Life Action, its donors, and other nonprofit civil society speakers.

80. South Dakota's law violates the First Amendment, incorporated against South Dakota through the Fourteenth Amendment, on its face and as applied to the communications of Students for Life Action.

81. Plaintiff is entitled to an injunction under 42 U.S.C. § 1983 barring the continued enforcement of S.D. Codified Laws § 12-27-16.

## COUNT III

**The on-ad donor disclosure rule violates the First and Fourteenth Amendments because it is void for vagueness.**

82.  South Dakota's definition of "independent communication expenditure" is "an expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person, entity, or political committee for a communication *concerning* a candidate or a ballot question." S.D. Codified Laws § 12-27-1(11) (emphasis added).

83.  The law does not define what it means for a communication to be "concerning" a candidate or ballot question.

84.  The law creates further confusion by expanding the definition of "independent communication expenditure" in S.D. Codified Laws § 12-27-16 to regulate "independent communication expenditures by persons and entities related to communications concerning candidates, *public office holders*, ballot questions, or political parties who are not controlled by, coordinated with, requested by, or made upon consultation with that candidate, political committee, or agent of a candidate or political committee" (emphasis added).

85.  Although the definition of "independent communication expenditure" in § 12-27-1(11) does not encompass communications "concerning" "public office holders," § 12-27-16 includes "communications concerning . . . public office holders" among those it regulates.

86.  Like § 12-27-1(11), § 12-27-16 does not defines what it means for a communication to be "concerning" a candidate, ballot question, or public office holder.

87.  "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

88.  "Vague laws may trap the innocent by not providing fair warning" and give rise to "arbitrary and discriminatory enforcement." *Id.*; *see Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997).

89.  "A law's failure to provide fair notice of what constitutes a violation is a special concern where laws abut upon sensitive areas of basic First Amendment freedoms because it inhibits the exercise of freedom of expression and inevitably leads [persons] to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1041 (8th Cir. 2012) (cleaned up). For that reason, "[w]here a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity." *United States v. Freeman*, 808 F.2d 1290, 1292 (8th Cir. 1987) (cleaned up) (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)).

90.  A vague law that affects First Amendment rights "is constitutionally invalid on its face." *Pursley v. City of Fayetteville*, Ark., 820 F.2d 951, 957 (8th Cir. 1987).

91.  Here, neither the provision nor its statutory context provides adequate information for citizens to know what communications will be considered to be "concerning" a candidate or ballot question. And citizens face criminal penalties if they guess wrong.

92.  Thus, the regulatory scheme is void for vagueness under the Fourteenth Amendment.

93.  Plaintiff is entitled to an injunction under 42 U.S.C. § 1983 barring the continued enforcement of S.D. Codified Laws § 12-27-16.

## PRAYER FOR RELIEF

Plaintiff Students for Life Action respectfully requests that this Court:

   a.  Declare that S.D. Codified Laws § 12-27-16 violates the First and Fourteenth Amendments on its face because it is overbroad;

   b.  Declare that S.D. Codified Laws § 12-27-16 compels speech in violation of Plaintiff's right to freedom of speech under the First and Fourteenth Amendments;

   c.  Declare that S.D. Codified Laws § 12-27-1(11) and § 12-27-16 are void for vagueness under the First and Fourteenth Amendments;

d.  Enjoin Defendants from enforcing S.D. Codified Laws § 12-27-16;

e.  Award Plaintiff its costs and attorneys' fees under 42 U.S.C. § 1988; and

f.  Award Plaintiff any further relief that the Court deems just and equitable.

Dated: September 14, 2023

Respectfully Submitted,

By: /s/ *[signature]*

Jacob Huebert (pro hac vice)
Noelle Daniel (pro hac vice)
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Telephone (312) 263-7668
jhuebert@libertyjusticecenter.org
ndaniel@libertyjusticecenter.org

/s/ Aaron P. Pilcher

Aaron Pilcher
Pilcher Law Firm
79 Third Ave. SE
Huron, South Dakota 57350
Telephone: (605)554-1661
aaronpilcherlaw@gmail.com

*Attorneys for Plaintiff Students for Life Action*